UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

VALLAIR SOLUTIONS SARL

            Plaintiffs,

-against-

321 PRECISION CONVERSIONS LLC,

            Defendants.

---------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/13/2003

21 Civ. 07507 (CM)(RWL)

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS DISMISSING THE SECOND AMENDED COMPLAINT[1]

McMahon, J.:

Plaintiff Vallair Solutions SARL ("Vallair") has asserted claims against Defendant 321 Precision Conversions LLC ("Precision") for breach of contract and breach of the implied covenant of good faith and fair dealing under N.Y. U.C.C. Law § 1-304. Vallair's claims arise out of a dispute over pricing and scheduling terms for the conversion of passenger aircraft to cargo aircraft under the Master and Conversion Agreements.

Defendant Precision moves for partial judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c); Precision seeks dismissal of Count I of the Second Amended Complaint ("SAC"). Specifically, Precision seeks dismissal on Vallair's claims that (1) Precision breached the pricing provisions of the Conversion Agreement; and that (2) Precision breached the implied covenant of good faith and fair dealing by failing to fairly negotiate the pricing provisions and refusing to

---

[1] Vallair filed the Second Amended Complaint without seeking leave of the Court to do so. However, because the Second Amendment Complaint makes only technical changes to the First Amended Complaint, the Defendant raises no objection. Dkt #58, at 1 n.1. Therefore, I am substituting the Second Amended Complaint for the First Amended Complaint.

1

provide documentary support for proposed pricing. Precision also seeks dismissal of Vallair's prayer for consequential damages, which Precision argues is barred by a liability limitation clause.

For the reasons set forth below, Defendant's motion is DENIED.

## BACKGROUND

### I.   Parties

Plaintiff Vallair is incorporated in Luxembourg. Vallair is in the business of "provid[ing] support for mature aircraft, engines and major components, including the conversion of aircraft from passenger to freighter (cargo) configurations." Vallair's principal place of business is located in Luxembourg's International Airport. SAC ¶ 1.

Defendant Precision, formerly Precision Program Development, LLC, is an Oregon limited liability company with its principal place of business in Beaverton, Oregon. "Precision is a leading design, engineering, manufacturing and certification provider of highly specialized and advanced aircraft conversion programs." *Id.* ¶ 2.

### II.   Facts

In or about February 2016, Vallair and Precision began discussions about forming a long-term relationship in which Vallair would deliver an Airbus A321-200 ("A321") commercial passenger aircraft to Precision to be converted from a passenger plane to a cargo plane. SAC ¶ 6. Both parties allege that at the time of negotiation, "no other company in the world could do these precise conversions . . . ." *Id.* ¶ 11; Dkt #122, at 11 n.4.

In order to perform the A321 passenger-to-cargo conversions, Precision needed to obtain a supplemental type certificate ("STC") from the United States Federal Aviation Administration ("FAA"), which is a certificate that provides approval to modify the original design of an aircraft

to a new type of design. *Id.* ¶¶ 8–9. Before it would issue the necessary STC, the FAA required Precision to create a prototype of the new aircraft, by converting an A321 passenger plane into a cargo plane. Dkt #122, at 2. The prototype then needed to pass ground and flight tests. SAC ¶ 10. Vallair agreed to provide Precision with the A321 aircraft that would be used to create the prototype. *Id.* ¶ 8. Once approved, Precision would be the first company in the United States authorized to perform these A321 passenger-to-cargo conversions, *id.* ¶ 6, and Vallair would be the first customer in line to have Precision convert its A321 passenger aircraft, which Vallair intended to then lease and sell to customers. Dkt. #122 at 1–2; SAC ¶ 33.

The parties negotiated three agreements to bring their business goals to fruition.

One of those agreements, the Conformity Agreement (signed April 30, 2017), set out the terms pursuant to which Precision would obtain the necessary STC from the FAA. SAC, Ex. 2. Pursuant to this contract, Vallair agreed to provide an A321 aircraft to Precision, *id.* at Ex. 1 § 1, and to fund certain costs of converting that A321 into a prototype cargo plane so that Precision could obtain FAA approval (without which there would be no further dealings between the parties). *Id.* ¶ 32, 36. The Conformity Agreement set a price at which Vallair would pay Precision for the work done to convert the A321 aircraft—$4.1 million—which was due when the conversion was complete. *Id.* ¶ 37, at Ex. 2 § 5. While the conversion and testing was taking place, Precision was to pay Vallair monthly rent ($50K per month) for use of the A321 aircraft, up to a maximum total payment of $1.875 million. *Id.* at Ex. 2 § 2.1; Dkt #122, at 3.

Precision did in fact convert the prototype, and it applied to the FAA for an STC. Dkt #122 at 6; SAC ¶ 68. Whether because of unanticipated delays in the conversion process or COVID-19 or bureaucratic incompetence, FAA approval was not obtained until April 28, 2021. Dkt #122 at 6; SAC ¶ 68.

3

A second agreement, the Conversion Agreement, was also signed on April 30, 2017. SAC, Ex. 3. Vallair's SAC contains a great deal of information about the negotiation of that agreement and the terms of various unsigned drafts of that agreement. *Id.* ¶¶ 14–30. As signed, the parties agreed that Vallair would have priority to select "slots" to deliver A321 aircraft to Precision that the latter would convert. *Id.* ¶¶ 11–12, at Ex. 3 §§ 1.2, 5. Vallair was to pay a predetermined fee to Precision for the converted A321 (known as Contract Aircraft) prior to redelivery. *Id.* ¶¶ 11–12, at Ex. 3 §§ 1.2, 5. For the "first three years" (April 2017–April 2020), that price was to be something called the "Basic Price for the Contract Aircraft." *Id.* at Ex. 3 §§ 7.1, Ex. 3 App. 10. From and after April 2020, the price would "be escalated . . . to Precision's prevailing rates." *Id.* at Ex. 3 App. 10. Vallair alleges that these preferential schedule terms were a part of the bargained-for consideration that led to the Conformity Agreement as well as the Conversion Agreement. *Id.* ¶ 12.

During the negotiations over the Conversion Agreement, it appeared that the parties might have at one point agreed on a number for a Basic Price for the first three-year period—in fact, Vallair insists that they did, *id.* ¶ 25—but no contract embodying any such agreement was ever signed. Instead, the parties effectively agreed to agree. The signed Conversion Agreement provided, in Section 7.1, that Vallair would pay the "Basic Price" for Precision to convert A321 aircraft after the conversion of the prototype. *Id.* at Ex. 3 § 7.1. The Conversion Agreement also contains a "Basic Pricing Index Matrix" (Appendix 10), which addresses the "Basic Price" issue without resolving it. *Id.* at Ex. 3 App. 10. For aircraft delivered for conversion prior to April 2020, the Basic Price was, "To be agreed based on the configuration of the Conversion" (this is true whether we are talking about Contract Aircraft Two or Contract Aircraft Eight). *Id.* The contract does not define the term "configuration of the Conversion[.]" Vallair insists that it has something

4

to do with how much cargo the converted aircraft could carry, *id.* ¶¶ 23–25, 14, while Precision acts as though the words don't appear in the contract at all.

Thereafter, the Basic Price was to escalate to "Precision's prevailing rate," *id.* at Ex. 3 App. 10, subject to a most favored nations ("MFN") clause that gave Vallair the benefit of any price break to another customer. *Id.* at Ex. 3 § 12.11. The contract does not specify what "prevailing rate" means (presumably, it is the rate Precision was charging other customers to convert planes for them); it does not specify how Vallair is to be apprised of "Precision's prevailing rate;" and it does not indicate how Vallair is supposed to know whether some other customer has a better deal that would provide Vallair with the benefit of its MFN clause (called the "Lowest Net Price Protection" in the agreement). Presumably such matters were comprehended in the contracting parties' duty of good faith and fair dealing, which is implied in every contract governed by New York State law. N.Y. U.C.C. Law § 1-304.

Aside from the Prototype, Vallair never delivered any aircraft for conversion by Precision, *id.* ¶ 72, principally because the parties could not agree on a Basic Price. *Id.* Precision insists that it had the right to dictate their price without offering any justification therefor. Dkt #122, at 12. Vallair contends that the contract required the parties to negotiate the price in good faith. It argues that Precision's refusal to provide documentation gave Precision carte blanche to unilaterally set the price and forced Vallair to rely on Precision's word that it was complying with the MFN clause, in violation of both the price terms of the Conversion Agreement and Precision's duty of good faith and fair dealing.  SAC ¶¶ 75, 78.[2]

### III.    Procedural Posture

---

[2] Both Vallair and Precision have entered into conversion contracts with third parties—a fact that is interesting but irrelevant to this motion. Dkt #139, at 5; Dkt #139, at 6 n.4.

Vallair has sued Precision for (1) breach of contract, and (2) breach of the covenant of good faith and fair dealing by refusing to reach agreement on a Basic Price or to provide Vallair with justification for its "prevailing rates." Vallair claims it lost money due to Precision's breach and failure to negotiate in good faith. Vallair seeks damages for "out of pocket costs, lost profits, loss of good will, loss of reputation, and all other damages . . . ." SAC ¶¶ 45, 71, 89(a). It is claiming, in essence, lost profits that it was unable to realize because of Precision's misconduct, including loss of third-party contracts. *Id.* ¶¶ 45, 89(a).

Precision asks for partial judgment on the pleadings, arguing that the facts alleged do not make out any breach either of contract or of the duty of good faith and fair dealing. It further argues that the type of consequential damages sought by Vallair are unavailable to it under the contract, which provides:

> EXCEPT TO THE EXTENT CAUSE BY WILLFUL MISCONDUCT, NO PARTY WILL BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, CONSEQUENTIAL DAMAGERS, OR EXEMPLARY DAMAGES WHATSOEVER, INCLUDING BUT NOT LIMITED TO DIRECT OR INDIRECT LOSS OF PROFITS, LOSS OF CONTRACTS, DIMINUTION OF VALUE OF THE CONTRACT AIRCRAFT, OR LOSS OF USE OF THE CONTRACT AIRCRAFT.

*Id.* at Ex. 3 § 12.2.

Vallair replies that Precision's conduct throughout reeks of bad faith, thereby allowing it to avoid the limitation on consequential damages under the "willful misconduct" exception in § 12.2. *Id.* ¶ 77.

## DISCUSSION

### I.  Legal Standard

Fed. R. Civ. P. 12(c) provides that, "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Under Rule 12(c), "a movant is

entitled to judgment on the pleadings only if she establishes that no material issue of fact remains to be resolved and that [she] is entitled to judgment as a matter of law." *Mack v. Comm'r of Soc. Sec.*, No. 12 Civ. 186, 2013 WL 5425730, at *6 (S.D.N.Y. Sept. 27, 2013) (internal quotation marks omitted). "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir. 1988). "On a Rule 12(c) motion, a court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case. A court may also review any document incorporated by reference in the pleadings or integral to the complaint." *Glascoff v. OneBeacon Midwest Ins. Co.*, No. 13 Civ. 1013, 2014 WL 1876984, at *4 (S.D.N.Y. May 8, 2014) (internal quotation marks omitted).

"A district court should render a declaratory judgment when such a judgment will (1) serve a useful purpose in clarifying and settling the legal relations in issue, and (2) terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Century Sur. Co. v. Franchise Contractors, LLC,* No. 14 Civ. 277, 2016 WL 1030134, at *3 (S.D.N.Y. Mar. 10, 2016) (internal quotation marks omitted).

In reviewing a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), the Court "must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009) (quoting *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003)). However, the Court need not accept as true "legal conclusions couched as factual allegations." *Id.* at 475–76. The counts at issue will survive a motion to dismiss so long as they contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, while the plaintiff need not include "detailed factual allegations," the complaint must provide more than "labels and conclusions, and a formulaic recitation" of the elements supporting a cause of action. *Bell Atlantic Corp.*, 550 U.S. at 555.

Both Plaintiff and Defendant agree that this Court has subject matter jurisdiction over this case, pursuant 28 U.S.C. § 1332(a)(2), personal jurisdiction over all parties, and that venue is proper in this Court. SAC ¶¶ 3–5; Dkt #58 ¶¶ 3–5. Furthermore, this dispute is governed by New York State law, as the Conversion Agreement specifies that "[t]his Agreement shall be governed by and construed in accordance with the laws of New York," and that "[w]ith respect to any suit, action, proceedings or dispute arising out of or in connection with this Agreement" the Parties consent to the "jurisdiction of . . . the United States District Court for the Southern District of New York . . . ." SAC, Ex. 3 § 12.6.

## II.    Breach of Contract

To establish a breach of contract under New York law a plaintiff must prove the following elements: (i) the existence of a contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach. *See, e.g., First Investors Corp. v. Liberty Mut. Ins. Corp.,* 152 F.3d 162 (2d Cir.1998).

### A.   Whether the Conversion Agreement is a Binding Preliminary Agreement.

It is not at all clear that the Conversion Agreement is an enforceable contract.

An enforceable contract requires a meeting of the minds on essential terms, which includes price. "There can be no fully formed, binding contract where material terms remain to be

8

negotiated." *Bear Stearns Inv. Prod., Inc. v. Hitachi Auto. Prod. (USA), Inc.*, 401 B.R. 598, 620

(S.D.N.Y. 2009) (citing *Ciaramella v. Reader's Digest Ass'n, Inc.,* 131 F.3d 320, 325 (2d Cir.

1997)). The Conversion Agreement does not contain a price, but merely an agreement to negotiate

the "Basic Price" in good faith. SAC, Ex. 3 App. 10. In such instances, "the issue arises as to

whether the preliminary agreement is a binding contract or an unenforceable agreement to agree."

*Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 547 (2d Cir. 1998).

New York State law generally recognizes two types of binding preliminary agreements.

The first type of preliminary agreement ("Type I") "is a fully binding preliminary agreement,

which is created when the parties agree on all the points that require negotiation (including whether

to be bound)[,] but agree to memorialize their agreement in a more formal document*." Id.* at 548.

"This kind of agreement is preliminary 'only in the sense that the parties desire a more elaborate

formalization of the agreement,' which, although not necessary, is desirable." *Murphy v. Inst. of

Int'l Educ.*, 32 F.4th 146, 150 (2d Cir. 2022) (quoting *Tchrs. Ins. & Annuity Ass'n v. Trib. Co.*,

670 F. Supp. 491, 498 (S.D.N.Y. 1987) ("Tribune")*). "*To determine whether a Type I binding

preliminary agreement exists, courts in this Circuit consider these factors: (a) whether there is an

express reservation of the right not to be bound in the absence of a writing; (b) whether there has

been partial performance of the contract; (c) whether all of the alleged contract terms have been

agreed upon; and (d) whether the agreement is customarily reduced to writing." *Bear Stearns Inv.

Prod., Inc.*, 401 B.R. at 618; *see, e.g.*, *Brown v. Cara,* 420 F.3d 148, 154 (2d Cir.2005); *R.G. Grp.,

Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1984); *Tribune*, 670 F. Supp. at 498. "No

single factor is decisive but each provides significant guidance." *R.G. Grp., Inc.*, 751 F.2d at 75.

The second type of preliminary agreement ("Type II") "is created when the parties agree

on certain major terms, but leave other terms open for further negotiation. The parties 'accept a

mutual commitment to negotiate together in good faith in an effort to reach final agreement.'"
*Adjustrite Sys., Inc.*, 145 F.3d at 548. In contrast to a Type I preliminary agreement, a Type II
preliminary agreement "does not commit the parties to their ultimate contractual objective but
rather to the obligation to negotiate the open issues in good faith in an attempt to reach the . . .
objective within the agreed framework." *Id.* (quoting *Tribune*, 670 F. Supp. at 498) (internal
quotation marks omitted). Therefore, "while a party to a Type I preliminary agreement may
demand performance of the transaction even if 'no further steps have been taken following the
making of the "preliminary" agreement,' a party to a Type II preliminary agreement 'may not.'"
*Bear Stearns Inv. Prod., Inc.*, 401 B.R. at 624 (quoting *Tribune*, 670 F. Supp. at 498). But "under
a Type II agreement, a party may demand 'that his counterparty negotiate the open terms in good
faith toward a final contract incorporating the agreed terms.'" *Murphy*, 32 F.4th at 151 (quoting
*Tribune*, 670 F. Supp. at 498). "[I]f a final contract is not agreed upon, the parties may abandon
the transaction as long as they have made a good faith effort to close the deal and have not insisted
on conditions that do not conform to the preliminary writing." *Adjustrite Sys., Inc.*, 145 F.3d at
548 (citing *Tribune*, 670 F. Supp. at 498).

The Second Circuit provides a five-factor test to aid in determining whether a Type II
binding preliminary agreement exists: "(a) whether the intent to be bound is revealed by the
language of the agreement; (b) the context of the negotiations; (c) the existence of open terms; (d)
partial performance; and (e) the necessity of putting the agreement in final form, as indicated by
the customary form of such transaction." *Bear Stearns Inv. Prod., Inc.*, 401 B.R. at 625 (quoting
*Brown*, 420 F.3d at 157). These factors closely follow the Type I four-factor test, but they "have a
somewhat different significance where . . . the nature of the contract alleged is that it commits the
parties in good faith to negotiate the open terms." *Tribune*, 670 F. Supp. at 499. "[I]f the question

is whether the parties bound themselves to negotiate in good faith towards a mutual contractual end, then 'the language of the agreement, its contents and omissions, and the context in which it was negotiated and signed, may lead to different conclusions." *Bear Stearns Inv. Prod., Inc.*, 401 B.R. at 625 (quoting *Brown*, 420 F.3d at 157).

Ordinarily, "[t]he ultimate issue . . . 'is the intent of the parties: whether the parties intended to be bound, and if so, to what extent." *Vacold LLC v. Cerami*, 545 F.3d 114, 125 (2d Cir. 2008) (quoting *Adjustrite Sys., Inc.*, 145 F.3d at 548–49).

Here, the parties concede their intent to be bound. Both agree that, "The Conversion Agreement is a valid and enforceable contract." Dkt #58 ¶ 55; SAC ¶ 82. Further, the text of the Conversion Agreement states that, "To Document Their Agreement, and their intention to be bound by the terms and conditions set forth below, the Parties execute this Agreement." SAC, Ex. 3, at 1 of Commercial Terms.

Therefore, as in *Murphy v. Inst. of Int'l Educ.*, the issue is not "whether the parties intended to be bound," but "how the parties intended to be bound." *Murphy*, 32 F.4th at 151–52 (quoting *Vacold LLC*, 545 F.3d at 125). In evaluating which type of preliminary agreement exists, courts are obligated to "keep two competing interests in mind," *Adjustrite Sys., Inc.*, 145 F.3d at 548: (1) "avoid[ing] trapping parties in surprise contractual obligations[;]" and (2) "enforce[ing] and preserv[ing] agreements that were intended as binding, despite a need for future documentation or further negotiation." *Tribune*, 670 F. Supp. at 497–98. And "[w]hile '[t]here is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals[,] and expressly anticipate future preparation and execution of contract documents,' *Arcadian*, 884 F.2d at 73 (quoting *Tribune*, 670 F. Supp. at 499), that presumption can be overcome and 'courts should not frustrate [parties] achieving [their] objective[s] or

11

disappoint legitimately bargained contract expectations[.]'" *Murphy*, 32 F.4th at 151–52 (quoting *Vacold LLC,* 545 F.3d at 128).

When evaluating what type of preliminary agreement exists between the parties, "the most important consideration" is the four corners of the agreement at issue. *Id.* at 152. It is clear from the text that the Conversion Agreement is not an agreement where "all of the alleged contract terms have been agreed upon," because, as already stated, the "Basic Price" was never agreed on. The contract states that the "Basic Price" is "[t]o be agreed based on the configuration of the Conversion." SAC, Ex. 3 App. 10. While no one factor is dispositive, and while courts may consider other factors, *Murphy*, 32 F.4th at 151, this failure points squarely away from a Type I preliminary agreement.

A Type II preliminary agreement is an enforceable agreement to negotiate in good faith under the conditions outlined to achieve the overall goal. That seems to be what we have here. In this case, the overall goal is to convert multiple A321 aircraft. The parties agreed to negotiate the "Basic Price" in good faith in order to achieve that goal, and they "inten[ded] to be bound by the terms and conditions" of the Agreement. SAC, Ex. 3 at 1 of the Commercial Terms.

The second factor is "whether the context of the negotiations demonstrates an intent of the parties to be bound by a preliminary commitment to negotiate the terms of their final agreement in good faith." *Bear Stearns Inv. Prods., Inc.*, 401 B.R. at 626. The Agreement as a whole comprises the Master Agreement, the Conversion Agreement, and the Conformity Agreement. Vallair argues that the agreed-upon terms of the Conversion Agreement were part of the consideration for the Conformity Agreement, which has now been completed. Specifically, The Master Agreement states that once the STC is obtained, "Precision will implement . . . a Conversion program and Customer will benefit from an agreed number of slots in this program."

12

SAC, Ex. 1, at 1. Vallair alleges that these preferential schedule terms were a part of the bargained-for consideration that led to the Conformity Agreement, *id.* ¶ 12, and that it fulfilled its part of the Conformity Agreement "in reliance upon Precision's agreement to give Vallair, its launch customer, among other benefits . . . slots for 40 conversions over 10 years . . . ." *Id.* ¶ 79. However, that consideration seems to ultimately be an agreement to agree in good faith, and only until April 2020.

The arrangement between the parties, viewed holistically, points to an understanding between the parties that they were bound by the entirety of the agreement, and therefore, bound to negotiate in good faith on the last remaining term—the price for conversion of Contract Aircraft for the first three years. The fact that the price term is open satisfies the third factor. The SAC alleges that Precision and Vallair were in ongoing negotiations over the Basic Price of the Contract Aircraft from and after March 16, 2020, SAC ¶ 51—an allegation I must accept as true for this motion. "The very fact that the parties undertook significant negotiations of additional contractual terms left undecided by the initial agreement supports a finding that the parties considered the initial agreement to bind them to take further steps to complete the final contract in good faith." *Bear Stearns Inv. Prods.*, 401 B.R. at 626.

The fourth factor, partial performance, also points to a finding of a Type II preliminary agreement. The Conformity Agreement seems to have been completed entirely, although that agreement is only one part of the parties' overall arrangement. Further, both parties have attempted to comply with § 1.2 of the Conversion Agreement, although whether in good faith or not has yet to be determined. "[T]his factor favors the conclusion that both sides considered the commitment binding." *Tribune*, 670 F. Supp. at 502.

Finally, the fifth factor looks at "the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Brown*, 420 F.3d at 157. "[I]t, of course, makes sense that multi-million dollar transactions would ultimately be committed to a formal writing . . . ." *Bear Stearns Inv. Prods.*, 401 B.R. at 627. The nature of the transaction and negotiation point to a necessity to memorialize the final pricing determination in a further writing.

Applying the five-factor test, I am persuaded that the Conversion Agreement is a Type II preliminary agreement, binding the parties to negotiate the remaining pricing term in good faith. Therefore, Vallair may assert a cause of action for Precision's alleged failure to negotiate in good faith, in breach of the Type II agreement and in violation of New York's inherent covenant of good faith and fair dealing.

Precision insists that the contract is unambiguous in that, for aircraft delivered prior to April 2020 (there were none), the price was "to be agreed." Dkt #122, at 1, 4, 9. While that provision is indeed ambiguous (because it does not specify what "configuration of the Conversion" means, and the Basic Price was to be a function of that), it is also irrelevant, since the complaint does not allege that any aircraft were delivered during this period. Precision also happily skips over the good faith negotiation aspect of the agreement because, it says, a price WAS agreed for aircraft delivered from and after April 2020—"Precision's prevailing rates." Dkt #122, at 11 n.4. I cannot conclude that this term is unambiguous (as Precision argues, albeit in a footnote). The fair implication of the pleading is that there were no prevailing rates for the conversion of A321 passenger planes to cargo planes in 2017, when the Conversion Agreement was signed, or even in 2020 when the first three-year period expired. The meaning of the term is not so self-evident that I can dismiss Vallair's complaint at this preliminary stage.

14

The parties have failed to brief a number of salient issues on the question of whether the Conversion Agreement is a binding preliminary agreement or an enforceable contract at all, but consideration of these issues must abide the close of discovery and possible motion for summary judgment. I thus deny the motion for partial judgment on the first issue—breach of the pricing provisions in the Conversion Agreement.

The motion for partial judgment on the second issue—whether Precision breached the implied covenant of good faith and fair dealing—is also denied. The good faith and fair dealing term is implied in every contract. Vallair alleges, and I must assume the allegation to be true, that Precision failed to negotiate a price and failed to provide Vallair with information that could allow it to evaluate Precision's offered price for post-prototype conversions. Those are questions that cannot be answered on a motion adhering to the pleadings.

### B. Whether consequential damages are barred by the Conversion Agreement.

The final issue is the motion for dismissal of Vallair's prayer for consequential damages, which Precision argues is barred by the liability limitation clause. The liability limitation clause bars consequential damages unless there is a finding of willful misconduct. Whether there is willful misconduct is a question of fact that cannot be decided on the pleadings.

Accordingly, the motion is DENIED.[3]

### CONCLUSION

For the reasons discussed above, the motion for partial judgment is DENIED.

---

[3] Among the many issues the parties did not brief is whether consequential damages of the sort sought by Vallair are available as a matter of New York State law. I have some views on that but am content to keep them to myself until the parties weigh in.

15

Dated: November 9, 2023

U.S.D.J.

BY ECF TO ALL COUNSEL